**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
Harrisonburg Division

| | | |
|---|---|---|
| **REBECCA G. HISE,** | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 5:13-cv-00037 |
| v. | ) | |
| | ) | |
| **CAROLYN W. COLVIN,**[1] | ) | |
| Acting Commissioner | ) | |
| Social Security Administration, | ) | By:    Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

## REPORT AND RECOMMENDATION

Plaintiff Rebecca G. Hise asks this Court to review the Commissioner of Social

Security's ("Commissioner") final decision denying her application for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 401–434, 1381–1383f. Both parties have moved for summary

judgment and filed briefs in support. (ECF Nos. 14, 15, 17, 18.) Hise makes four arguments on

appeal. First, she argues that the Administrative Law Judge ("ALJ") did not properly evaluate

her fibromyalgia. Second, Hise argues that the ALJ misapplied the law when evaluating a non-

acceptable medical source's opinion on her functional limitations. Third, she argues that the ALJ

did not properly consider her claims of pain. Fourth, Hise challenges the ALJ's determination of

her residual functional capacity (("RFC"). Hise asks this Court to award benefits, or to remand

for a "proper determination of medical equivalence" regarding her fibromyalgia.

This Court has the authority to decide Hise's case under 42 U.S.C. §§ 405(g), 1383(c)(3),

and her case is before me by referral under 28 U.S.C. § 636(b)(1)(b). (*See* ECF No. 19.) After

carefully reviewing the administrative record, the parties' briefs, and the applicable law, I find

---

[1] Colvin became Acting Commissioner of the Social Security Administration on February 14, 2013. Carolyn W. Colvin is therefore substituted for Michael J. Astrue as the defendant in this suit. *See* Fed. R. Civ. P. 25(d).

that the ALJ properly applied the law and that substantial evidence supports his decision that Hise is not disabled. Therefore, I **RECOMMEND** that this Court **DENY** Hise's Motion for Summary Judgment (ECF No. 14), **GRANT** the Commissioner's Motion for Summary Judgment (ECF No. 17), and **DISMISS** this case from the Court's active docket.

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final determination that a person is not entitled to disability benefits. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if " 'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.' " *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a]

factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a) (governing claims for DIB), 416.905(a) (governing adult claims for SSI). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Hise protectively filed for DIB and SSI on January 21, 2010, alleging disability beginning January 1, 2007. (R. 48, 51.) At the time, she was 42 years old, had an 11th grade education, and had worked as a retail manager, cashier, and waitress. (*See* R. 48, 67; *see also* R. 30.) Hise said that she could not work anymore because of chronic back pain, "fibromyalgia throughout [her] whole body," depression, and anxiety. (R. 48, 51.) A state agency twice denied Hise's application. (*See* R. 57, 68, 85, 100.)

On November 17, 2011, Hise appeared with counsel at an administrative hearing. (R. 24.) Hise testified as to her physical and mental impairments and the limits those impairments had on her daily activities. (*See generally* R. 32–40.) A Vocational Expert ("VE") also testified as to the type of jobs Hise could perform given her age, work history, and functional limitations. (*See generally* R. 42–46.) In a written decision dated December 21, 2011, the ALJ found that Hise was not disabled after January 1, 2007. (R. 22.) He denied Hise's application at Step Five. (*See generally* R. 16–22.)

At Step One, the ALJ found that Hise had not engaged in substantial gainful activity since January 1, 2007. (R. 16.) At Step Two, he found that Hise suffered from severe fibromyalgia, degenerative disc disease, carpal tunnel syndrome, bladder spasms/urinary disorder, pseudo-seizure disorder, gastrointestinal disorder, and obesity. (R. 16.) The ALJ also found that Hise's depression and affective disorder were "non-severe" impairments. (R. 17.) At Step Three, the ALJ concluded that Hise did not have a severe impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 18.) He compared Hise's impairments to the criteria in Listings 1.02 (major dysfunction of a joint due to any cause), 1.04 (disorders of the spine), and 11.03 (non-convulsive epilepsy). (*See id.*)

Before reaching Step Four, the ALJ determined that Hise had the RFC[2] to do sedentary work that allowed her to "alternate between sitting and standing." (*Id.*) Specifically, the ALJ found that Hise could: (1) sit for 30 minutes at one time and for up to six hours in an eight-hour day; (2) stand for 10 minutes at a time; (3) frequently "handle and finger" objects with both

---

[2] "RFC" is an applicant's maximum ability to work "on a regular and continuing basis" despite his or her limitations. Soc. Sec. R. 96-8p, 1996 WL 374184, at *1 (Jul. 2, 1996). The RFC takes into account "all of the relevant medical and other evidence" in the applicant's record, 20 C.F.R. §§ 404.1545(a), 416.945(a), and reflects the "total limiting effects" of the person's impairments, *id.* §§ 404.1545(e), 416.945(e).

hands; (4) frequently balance, crouch, and climb ramps and stairs; and (5) occasionally stoop, kneel, and crawl; but (6) "should avoid concentrated exposure to hazardous machinery and unprotected heights." (*Id.*)

In making this determination, the ALJ considered the extent to which Hise's impairments and symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence" in her record. (R. 19.) He also considered Hise's testimony and opinions from her physician assistant, a consultative physician, and a state-agency source. (R. 19–20.) The ALJ found that Hise's impairments could reasonably cause her symptoms, but that Hise's description of those symptoms' intensity, persistence, and limiting effects was "not credible to the extent that [it was] inconsistent with the above residual functional capacity assessment." (R. 20–21.) He also found Hise's credibility "questionable due to her repeat [*sic*] non-compliance and failure to make sincere efforts to rehabilitate." (R. 21.)

At Step Four, the ALJ concluded that Hise could not return to her past jobs as a waitress, retail cashier, or hotel desk clerk. (*Id.*) The VE testified that each of these jobs involved "light" work, which is more physically demanding that "sedentary" work. (R. 41–42.) At Step Five, the ALJ concluded that Hise could still perform certain "unskilled" sedentary occupations such as inspector, assembler, and packager. (R. 22.) The ALJ based this conclusion on his assessment of Hise's RFC and the testimony of the VE. (*Id.*) Thus, he found that Hise was not disabled between January 1, 2007, and December 21, 2011. (R. 22–23.) The Appeals Council declined to review the ALJ's decision (R. 1, 4), and this appeal followed.

### III. Discussion

Hise makes four arguments on appeal. First, regarding her fibromyalgia and back pain, she argues that the ALJ "refused to consider medical equivalency and failed to obtain a medical

expert opinion on the issue of equivalency." (Pl. Br. 10.) Second, Hise argues that the ALJ misapplied the law when evaluating a physician assistant's opinion on her functional limitations. (*Id.* 11–12.) Third, she argues that the ALJ did not properly consider her claims of pain. (*Id.* 12–13.) Finally, Hise argues challenges the ALJ's RFC determination. (*Id.* 13–16.)

A.     *Medical Equivalency*

Hise first argues that the ALJ erred at Step Three when he "failed to obtain a medical opinion and [to] fully analyze medical equivalence for her Fibromyalgia in accordance with [Social Security Ruling] 99-2p." (Pl. Br. 9.)  Social Security Ruling 99-2p, 1999 WL 271569 (Apr. 30, 1999), provides guidance on how to evaluate claims that an applicant is disabled by Chronic Fatigue Syndrome ("CFS"). A footnote to that ruling says that there "is considerable overlap of symptoms between CFS and Fibromyalgia . . . ," *id.* at *3 n.3, and it indicates that the presence of trigger points may substantiate a diagnosis of Fibromyalgia, but it provides minimal additional guidance on how to evaluate the latter condition.[3]

Hise argues that her diagnoses of fibromyalgia and disc herniation,[4] as well as one positive straight-leg test in January 2011, are "sufficient to support a finding of medical

---

[3] Social Security Ruling 12-2p, "Evaluation of Fibromyalgia," went into effect on July 25, 2012. *See* Soc. Sec. R. 12-2p, 2012 WL 3104869 (Jul. 25, 2012.) The effective date fell after the ALJ issued his decision, but several months before the Appeals Council refused Hise's request for review. (*See* R. 1.) Applying the "laws, regulations, and rulings in effect" on January 31, 2013, the Appeals Council "found no reason under [its] rules to review the [ALJ's] decision." (*Id.*) Presumably, the Appeals Council concluded that it would not be legal error if the ALJ did not specifically evaluate Hise's fibromyalgia under Ruling 12-2p. (*See id.*) Hise did not object to that conclusion. (*See* Pl. Br. 9 n.1.)

[4] There is no evidence in the record that Hise has been diagnosed with a herniated disc. On January 29, 2011, consultative examiner Dr. John Scagnelli, M.D., wrote that Hise's back pain was "possibly related to lumbar disc herniation given her positive straight leg tests," and that this "should be" evaluated if it had not been already. (R. 869.) Hise underwent imaging studies for "possible disc herniation" in 2005. (R. 336–37.) Those results were normal. (R. 337.) Imaging studies conducted in February 2008 revealed only "small amounts of disc bulging in the cervical spine." (R. 762.) X-rays of Hise's lumbar spine taken in September 2010, showed "no abnormalities" and "no emergent etiology" for her chronic back pain. (R. 760–61; *see also* R. 762, 764.). Regardless, a diagnosis alone cannot establish medical equivalency under the regulations. *Cf.* 20 C.F.R. §§ 404.1525(d), 416.925(d) ("Your impairments cannot meet the criteria of a listing based only on a diagnosis.").

equivalence" for the criteria in Listing 1.04, Disorders of the Spine. (Pl. Br. 9-10.) A person is necessarily disabled by a disorder of the spine (*e.g.*, degenerative disc disease) if that disorder "result[s] in compromise of a nerve root . . . or the spinal cord" with:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthsia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in [§] 1.00B2b.

20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04. Hise bears the burden of producing "medical findings . . . supported by medically acceptable clinical . . . diagnostic techniques" showing that her fibromyalgia and back pain are "at least equal in severity," 20 C.F.R. §§ 404.1526(a), 416.926(a), "to *all* the criteria," *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990), in Listing 1.04. She also must establish that her combined impairments render her unable to perform *any* gainful activity, not just *substantial* gainful activity. *Zebley*, 493 U.S. at 532. Importantly, Hise cannot establish medical equivalence merely "by showing that the overall functional impact" of her fibromyalgia and back pain "is as severe as that of [the] listed impairment." *Id.* at 531.

### 1. *Evidence of Hise's Fibromyalgia and Back Pain*

The record is replete with Hise's complaints of whole-body and low-back pain after her alleged onset date. (*See*, *e.g.*, R. 263, 411–25, 438–41, 509, 519, 551, 622, 633–34, 689, 700, 708, 713, 716, 746, 748, 758, 761, 768–69, 777, 811, 817, 831, 834, 865, 894–95, 897, 898, 900,

1030, 1040.) Hise has attributed her back pain to injuries sustained during a fall from a ladder in 2003 (R. 519, 525), in a work-related accident in 2004 (R. 902), during a fall from a ladder in 2005 (R. 522, 763), or while lifting a heavy object at work in 2005 (R. 475, 713). Hise underwent comprehensive imaging studies in 2005 and 2008 to rule out a herniated disc or other orthopedic abnormalities. (*See* R. 336–37, 614–15.) Those studies were essentially normal. (*See id.*) As one reviewing emergency-room physician summarized in September 2010:

> The patient has had CT scan imaging of the thoracic and lumbar spine in February 2008 and CT imaging of the cervical spine six different times in the past two years. She has also had an MRI of the cervical spine and L-spine. Though she has small amounts of disc bulging in the cervical spine, she has had no other structural abnormality identified.

(R. 762.)

Dr. Marisa Christensen, M.D., one of Hise's former treating physicians, first suspected that Hise had fibromyalgia in April 2008 when Hise complained that she was fatigued and "seem[ed] to have pain all over," including in her lower back, "neck, shoulders, hips, and into the legs." (R. 895.) Dr. Christensen observed that Hise had "tender points over her neck at the occiput, over her lateral shoulders, the lateral elbows, [and] superior to the knees." (*Id.*) She referred Hise to a pain specialist and physical therapy and recommended that Hise "remain off work until she starts physical therapy and initiates medication for the fibromyalgia."[5] (*Id.*)

In August 2008, Hise told specialists at the University of Virginia's ("U. Va.") Pain Management Center that she had experienced "whole body pain" for the past five years. (R. 525.) The pain began in her lower back, but then "just started to spread over her whole body, which is now constant, aching, sharp, burning, shooting, and cramping in nature, 9/10, worse

---

[5] In August 2008 and January 2009, Dr. Christensen also opined that Hise was at least temporarily disabled by her fibromyalgia. (R. 891, 883.) Although the ALJ did not mention Dr. Christensen's opinions that Hise was temporarily unable to work, they would not have been entitled to any special weight under the regulations. *See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

with any movement standing or sitting, better with lying down, heating pads, and Ambien, which helps her sleep 8 hours a night." (*Id.*) Hise also complained of weakness, numbness, and tingling in all extremities. (*Id.*) On exam, the physician observed 18/18 positive fibromyalgia tender points, but normal range of motion in the cervical and lumbar spine, shoulders, elbows, wrists, hips, knees, and ankles. (R. 526.) Hise also had full strength in all extremities. (*Id.*) The clinic referred Hise for aquatherapy and instructed her to follow up in one or two months. (R. 527.)

In January 2009, Dr. Christensen noted that Hise was not following medical advice and did "not seem to be too motivated to undergo treatment [for fibromyalgia], which would potentially help her get better." (R. 883.) Dr. Christensen discharged Hise from her practice one month later for habitual nonattendance and noncompliance. (R. 881.) She again noted that Hise did "not really seem motivated to help herself . . . get better" or to manage her fibromyalgia symptoms with anything except prescription medication. (*Id.*)

Hise returned to U. Va.'s pain clinic in October 2009, more than one year after her initial visit. (*See* R. 519.) She complained of "diffuse body pain for approximately 5 years," which on this day was reportedly "7/10 . . . generalized aching, stabbing [and] shooting." (*Id.*) The physician noted that Hise never utilized the clinic's August 2008 referral to aquatherapy and was not compliant with her medications. (R. 519–20.) On exam, Hise had "diffuse mild fascial tenderness throughout her body," but her straight-leg tests were negative and she had full strength in all extremities. (R. 520.) The clinic adjusted Hise's medications, referred her to physical therapy, and instructed her to return in three months. (R. 521.)

Hise went back to the pain clinic in December 2010, more than a year after her last visit. (R. 1040.) On this visit, she complained of "sharp" pain in her "neck, across her shoulders, down her back, and in her hips." (*Id.*) Hise also felt that "her other pain would fall in line" if she could

get her back pain under control. (*Id.*) On exam, the physician noted "decreased range of motion, tenderness, and pain" throughout. (*Id.*)

Other doctors have also observed that Hise's lower back and extremities are tender to palpation. (*See*, *e.g.*, R. 438, 511, 632, 634, 746, 764, 832, 838, 883, 1032; *but see* R. 633.) For example, an emergency-room physician observed in September 2009 that Hise "essentially hurt[]" no matter where he touched her even though she was not obviously injured. (R. 634.) Still, most of Hise's many trips to the emergency room ended in a prompt discharge with pain medication and instructions to follow up with her primary care provider. (*See*, *e.g.*, 511, 632, 635, 639, 689, 692, 695, 699, 701, 702, 705, 716, 718, 747, 775; *but see* R. 728, 1003.)

Several treating and examining physicians have also expressed concern over Hise's requests for specific prescription-strength pain killers. (*See*, *e.g.*, R. 634, 635, 637, 639, 883, 897, 899.) Still others have noted that Hise does not take her medications as prescribed, including those used to treat pain and muscle spasms. (*See, e.g.*, R. 520.) At least four health-care providers have discharged Hise from their practices because she has ignored medical advice and failed to keep appointments. (*See* R. 627, 740, 881, 916–17.) In early 2009, for example, Dr. Christensen observed that Hise was not motivated to undergo treatment that could help control her fibromyalgia symptoms. (R. 883; *see also* R. 881.) Rather, Hise "seem[ed] content to show up at the [emergency department] every couple of w[eeks] or so" when she allegedly injured herself. (R. 881.) Dr. Christensen also flatly refused to prescribe narcotics for Hise's fibromyalgia symptoms because she had recently exhibited drug-seeking behavior. (*See* R. 883.)

    *2.    Analysis*

The ALJ concluded that Hise's impairments did not equal the criteria in Listing 1.04(A)–

(C) because there was no medical "evidence of nerve root compression, spinal arachoniditis, [or] lumbar spinal stenosis." (R. 18.) He also found that Hise's impairments had not "resulted in an inability to ambulate effectively" as that term is defined in the regulations. (*Id.*) Later, the ALJ doubted whether Hise's pain was as severe as alleged because she had repeatedly failed to comply with prescribed treatments for her fibromyalgia and back pain. (R. 21.)

To be sure, the ALJ's equivalency analysis is not a picture of clarity. It is at times difficult to tell which of Hise's musculoskeletal impairment(s) the ALJ considered because he does not name them when discussing the criteria in Listings 1.02 (major dysfunction of a joint due to any cause) and 1.04 (disorders of the spine). (*See* R. 18.) However, the ALJ did identify the relevant listed impairments and compared their criteria to Hise's medical records documenting her complaints of chronic back pain and fibromyalgia. (*See id.*) *See Cook v. Heckler*, 783 F.2d 1168, 1174 (4th Cir. 1986) (finding ALJ's equivalency analysis "adequate" where he identified the relevant listed impairments and "made a relatively careful comparison" between the applicant's symptoms and the listed criteria).

Listing 1.04 requires medical evidence that a musculoskeletal impairment(s) "resulted in a compromise of a nerve root . . . or the spinal cord." 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04. Hise cites no medical finding, and I can find none in her record, that establishes her fibromyalgia and back pain are at least equal in severity to this requirement. (*See* Pl. Br. 9–10.) On the contrary, an MRI in June 2008 showed "no abnormality" in the spinal cord and "no nerve root compression." (R. 614–15.) Images of Hise's spine in 2009 also showed at most "some mild degenerative changes." (R. 570; *see also* R. 573.) And lumbar spine x-rays taken in September 2010 showed "no abnormalities" and "no emergent etiology" for Hise's chronic back pain. (R. 760–61; *see also* R. 762, 764.) Hise's gait is generally unremarkable, even on days she

complained of constant widespread "aching, sharp, burning, shooting and cramping" pain that gets worse with "any movement." (R. 519–20; *but see* R. 526 (noting a "slightly antalgic" gait).) And at least one emergency-room physician has noted that Hise's occasional difficulty walking is likely more psychological than physical. (R. 778.)

Nor was the ALJ required to obtain an outside expert medical opinion on whether Hise's impairments equaled the criteria in Listing 1.04. *See Smith v. Astrue*, 457 Fed. App'x 326, 328 (4th Cir. 2011) (per curiam). The ALJ obtained the necessary medical opinion when he received into the record a Disability Determination and Transmittal Form signed by state-agency medical consultant Dr. William Amos, M.D., stating Hise's combined impairments did not equal the criteria in Listing 1.04. (*See* R. 87–101.) Dr. Amos expressed that opinion in February 2011 after Dr. John Scagnelli, M.D., at the agency's request, examined Hise for fibromyalgia and chronic back pain. (*See* R. 89.) These examinations were sufficient under agency policy. *See id.*; *see also* Soc. Sec. R. 96-6p, 1996 WL 374180, at *3 (Jul. 2, 1996).

I must uphold the ALJ's finding on medical equivalency if he applied the correct legal standard and if his finding is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (defining "substantial evidence"). I find that both requirements were met here. Furthermore, the ALJ did not doubt that Hise's back pain and fibromyalgia would impose *some* limitations in the workplace. (*See* R. 21.) He accommodated those limitations by restricting Hise to "sedentary" jobs that allowed her to "alternate between sitting and standing." (R. 18.) As explained below, that finding is also supported by substantial evidence in the record.

B.    *Non-Acceptable Medical Source Opinion*

Hise next argues that the ALJ misapplied 20 C.F.R. § 404.1513 and Social Security

Ruling 06-3p when he gave "little weight" to the opinions of Hise's "treating"[6] physician

assistant, Barry Munsey. (Pl. Br. 10–11.) As Hise recognizes, physician assistants like Munsey

are "non-acceptable medical sources" who cannot give "medical opinions" about the applicant's

condition. Soc. Sec. R. 06-03p, 2006 WL 2329939, at *2. Evidence from other sources, like

physician assistants, may provide relevant information about the severity of an impairment and

its effect on a claimant's ability to work. 20 C.F.R. §§ 404.1513(d), 416.913(d). Although the

ALJ must consider their opinions as he would any other evidence in the record, these opinions

are not entitled to any particular weight. *See* Soc. Sec. R. 06-03p, 2006 WL 2329939, at *3–4,

*6. Indeed, the ALJ is generally not required to explain the weight given to non-acceptable

medical source opinions unless it may affect the case's outcome. *See id.* at *6.

In evaluating a non-acceptable medical source's opinion, the ALJ may consider the

length and nature of the source's relationship with the applicant, the opinion's consistency with

other evidence in the record, how well the source explains his opinion, the source's specialty or

area of expertise, and any other factor that tends to support or refute the opinion. *See id.* (citing

the current 20 C.F.R. §§ 404.1527(c), 416.927(c)). Not every factor will apply in every case.

1.    *Mr. Munsey's opinions*

In November 2010 and January 2011, Munsey filled out three check-box forms for Hise

to submit with her pending application for disability benefits. (R. 1034–35, 1037–38, 1075–76.)

On November 3, 2010, he opined that Hise could "participate in employment and training

activities" for up to 20 hours each week "with limitations and/or modifications as needed." (R.

---

[6] The regulations do not consider "non-acceptable medical sources," such as physician assistants, to be
"treating" health-care providers whose opinions may be entitled to controlling weight. *See* 20 C.F.R. §§
404.1527, 416.927; Soc. Sec. Ruling 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

1037.) Munsey reported that Hise could not tolerate any lifting or "prolonged standing or walking" for the next six months. (R. 1037–38.) The only explanation he provided was that Hise had been diagnosed with chronic back pain and fibromyalgia. (R. 1037.)

Munsey filled out an identical form two weeks later, on November 18, 2010. (R. 1034–35.) This time, however, he indicated that Hise could not participate in *any* employment or training activities for the next two months. (R. 1034.) Again, Munsey cited only Hise's diagnoses of back pain and fibromyalgia. (R. 1035.) His contemporaneous treatment notes document little more than Hise's complaints of "chronic" lower-back pain and "worsening" fibromyalgia. (R. 1033, 1031.)

Munsey filled out this form once more on January 24, 2011. (R. 1076–77.) This time he reported that Hise could not participate in any employment or training activities for the next *six* months. (R. 1076.) He noted without further explanation that Hise's physical limitations were "due to chronic pain due to medical problems," which he again identified as chronic back pain and fibromyalgia. (R. 1076.) Munsey's contemporaneous treatment notes do not document any complaints of musculoskeletal pain. (*See* R. 1074.)

### 2.    *Analysis*

The ALJ gave Munsey's opinions "little weight" because they were "temporary, isolated in time, based largely on subjective criteria as opposed to objective findings," and made by a non-acceptable medical source. (R. 20.) Hise argues that the ALJ weighed Munsey's opinions without applying the factors in 20 C.F.R. § 404.1527(d). (Pl. Br. 11.) She also states without elaboration that "[p]roper consideration shows that Munsey has been providing direct clinical care to [Hise] in a family practice setting and his opinions are consistent with other medical evidence concerning her back pain and Fibromyalgia." (Pl. Br. 12.)

Hise's argument is unpersuasive. First, the ALJ is not required to consider each of the factors listed in 20 C.F.R. §§ 404.1527(c) and 416.927(c) when evaluating a non-acceptable medical source's opinions. *See* Soc. Sec. R. 06-03p, 2011 WL 2329939, at *4, *6. Here, the ALJ considered several of the listed factors, including the opinion's consistency with other evidence in the record, the absence of evidence supporting the opinions, and the fact that the recommended limitations were "temporary, [or] isolated in time." (R. 20.) He also found that Munsey's conclusory opinions were based "largely" on Hise's subjective reports. (*Id.*)

Additionally, the ALJ's decision to give Munsey's opinions "little weight" is supported by substantial evidence in the record. Munsey filled out three check-box forms in which he opined Hise needed a temporary reprieve from full-time work. (*See* R. 1034, 1037–38, 1076.) On November 3, the only explanation Munsey gave was that Hise had been diagnosed with "chronic" back pain and fibromyalgia. (*See* R. 1038.) Then, two weeks later, Munsey opined that Hise could not work at all for the next two months. (*See* R. 1034.) The only apparent explanation for the sudden switch is Hise's contemporaneous report that she was "not any better." (R. 1030.) The ALJ may give "significantly less weight" to even a treating physician's conclusory opinion when he finds it is "based on the applicant's subjective reports" of pain. *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). Accordingly, I find that the ALJ did not err in his treatment of Munsey's opinions.

## C.      *Hise's Credibility*

Hise also argues that the ALJ "failed to properly consider [her] pain and other subjective symptoms." (Pl. Br. 12.) In other words, Hise objects to the ALJ's finding that her complaints of disabling pain were not entirely credible. (*See id.* 12–13; *see also* R. 21.) It is not this Court's role to determine whether Hise was a credible witness. *See Craig*, 76 F.3d at 589; *see also*

*Shively v. Heckler*, 739 F.3d 987, 989 (4th Cir. 1984). Rather, the Court must be satisfied that the ALJ applied the correct legal standard in evaluating Hise's credibility and that substantial evidence supports his conclusion that her testimony was "questionable" or "not credible." (R. 21.) *See Craig*, 76 F.3d at 589.

ALJs follow a two-step process for evaluating an applicant's statements about her symptoms. *See* 20 C.F.R §§ 404.1529, 416.929; Soc. Sec. R. 96-7p, 1996 WL 374186 (Jul. 2, 1996). First, the ALJ must "consider whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce" the applicant's alleged symptoms. Soc. Sec. R. 96-7p, 1996 WL 374186, at *2. If there is, the ALJ "must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which [they] limit [her] ability to do basic work activities." *Id.* Whenever the applicant's symptoms are "not substantiated by objective medical evidence," the ALJ "must make a finding on the credibility of the individual's statements" in light of the entire record. *Id.* He must give specific reasons for the weight given to the applicant's statements, *id.*, and those reasons must be supported by substantial evidence in the record, *see Craig*, 76 F.3d at 589.

### 1. *Hise's Statements Describing Her Pain*

Hise testified that her back pain makes it difficult for her to sit for long periods of time. (*See* R. 33.) At the hearing, there was much discussion about the fact that Hise occasionally accompanies her truck-driving boyfriend on long-haul road trips. (*See* R. 32–34, 36.) Hise testified that she "lay[s] in the back most of the time" on these trips because it hurts her back to "sit upfront [*sic*] for very long." (R. 33.) When she's not on the road, Hise said that she "mainly . . . stay[s] in bed because [she is] in pain pretty much all the time." (R. 36.)

Hise did not testify as to the pain or functional limitations specifically associated with her fibromyalgia. (*See generally* R. 36–40.) She testified only that she had been diagnosed with and "take[s] medication for that" condition. (R. 36.) In November 2010, Hise wrote that she experienced constant aching, stabbing, throbbing, cramping, and sharp pain caused by "any kind of movement." (R. 283.) She said that this pain "gets alot [*sic*] worse" when she bends, squats, stoops, reaches, stands, or sits. (R. 284.) Lying on her side was the only thing that provided "some relief," she wrote. (*Id.*) At the time, Hise was taking Gabapentin, Ibuprofen, Savella, and Tramadol for pain. (R. 295.)

Describing her daily activities, Hise wrote that she can care for herself, but "it just takes a little while" for her to put on clothes. (R. 289.) She said she cooks "simple things," but does not do any house work or yard work "because it hurts too bad." (R. 290.) Hise also wrote that she "watches T.V. all the time" and "sometimes" does "search a word books." (R. 292.) The latter activity is difficult, though, because her "hands stay numb and hurt sometimes." (*Id.*) At her hearing, Hise testified that her fingers "stay numb all the time and [are] tingly." (R. 38.) She said her "hands constantly hurt," and that she has "trouble grasping things, holding on to things." (R. 38–39.)

The ALJ found that Hise's impairments "could reasonably be expected to cause the alleged symptoms," but that Hise's "statements concerning the intensity, persistence, and limiting effects of th[ose] symptoms [were] not credible" to the extent that they were inconsistent with the ALJ's RFC determination. (R. 20–21.) Further, her allegations were inconsistent with clinical and treatment records. (R. 19–21.) He noted that x-rays of her spine showed small disc bulges and mild degenerative changes. (R. 19.) This objective evidence and Hise's conservative treatment were "out of sync" with her complaints of disabling pain. (R. 19.) He also found Hise's

complaints of disabling pain generally were "questionable due to her repeat[ed] non-compliance and failure to make sincere efforts to rehabilitate." (R. 21.) The ALJ further noted disconnect between her medical conditions and her alleged limitations. (R. 20.)

2. *Analysis*

Hise argues that the ALJ "failed to conduct the proper analysis and failed to make the proper findings," particularly regarding her fibromyalgia. (Pl. Br. 12.) Her main objection is that the ALJ compared Hise's testimony about her fibromyalgia only to the objective medical evidence in her record. (*See id.* 12–13.) She argues that the "Fourth Circuit has stated in the case of Fibromyalgia, where symptoms are subjective, it is ***particularly*** inappropriate [for the ALJ] to consider only objective medical evidence and to ignore other factors such as pain medication, daily activities, and other aggravating factors." (*Id.* 12 (citing *Tench v. Comm'r, Soc. Sec. Admin.*, 2011 U.S. Dist. LEXIS 95744, at *22 (4th Cir. 2011).[7])

Hise is correct that subjective symptoms are crucial when evaluating the pain and limitations caused by fibromyalgia. *See Tucker v. Astrue*, No. 5:11-cv-137, 2013 WL 1211583, at *4 (W.D. Va. Mar. 1, 2013), *adopted by* 2013 WL 1196672 (W.D. Va. Mar. 25, 2013). Fibromyalgia "is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least [three] months." Soc. Sec. R. 12-2p, 2012 WL 3104869, at *2 (Jul. 25, 2012). Diagnosing someone with this condition is largely a diagnosis of exclusion based in part on the *absence* objective medical evidence, except for the presence of set "trigger" or "tender" points throughout the body. *See id.* at *3. Thus, it is indeed inappropriate for an ALJ to limit his step-two credibility analysis to the

---

[7] Hise mistakenly cited an opinion from the District of South Carolina, *Tench v. Comm'r, Soc. Sec.*, No. 6:10-cv-691, 2011 U.S. Dist. LEXIS 95744 (D.S.C. Aug. 25, 2011), as an opinion from the Court of Appeals for the Fourth Circuit.

objective medical evidence in the record. *Gavigan v. Barnhart*, 261 F. Supp. 2d 334, 342 n.11 (D. Md. 2003).

But the ALJ in Hise's case did not do that. (*See* R. 19–21.) The ALJ evaluated Hise's clinical and treatment notes and determined that her conditions could cause her symptoms, but did not substantiate the severity that she claimed. (R. 19–21.) *See Craig*, 76 F.3d at 595 (noting that an evaluation of the intensity and persistence of a claimant's pain and the extent to which her pain affects her ability to work must take into account a claimant's subjective statements as well as all the available evidence, including medical history and objective evidence) (citing 20 C.F.R. §§ 404.1529(c)(1)–(2),416.929(c)(1)–(2)).

The ALJ also discounted Hise's complaints of disabling musculoskeletal pain because he found that Hise had repeatedly failed to comply with prescribed medical treatment for her back pain and fibromyalgia.[8] (R. 20–21.) ALJs may consider non-compliance when evaluating an applicant's credibility. *See Myers v. Comm'r, Soc. Sec. Admin.*, 456 Fed. App'x 230, 231–32 (4th Cir. 2011); Soc. Sec. R. 96-7p, 1996 WL 374186, at *7–8. Hise correctly notes that the ALJ should have first considered whether she had "good reasons" for her non-compliance. (Pl. Br. 13). *See Manteris v. Astrue*, No. 3:10-cv-34, 2011 WL 1225994, at *2–3 (citing Soc. Sec. R. 96-7p, 1996 WL 374186, at *7–8). But his failure to do so does not mean that he misapplied the law

---

[8] Discussing the evidence of Hise's back pain and fibromyalgia, the ALJ noted that, "apart from [Hise's] allegations, there is no corroborative evidence to substantiate her claims of disabling limitations." (R. 19.) To support that conclusion, the ALJ cited Dr. Robert Cocke's "opinion" that," 'there is no clinical reason for her to feel this way,' as 'her strength was fine, x-rays were fine, with no fracture, dislocation, or abnormalities, and her lab (blood) work was within normal limits' " (R. 19 (quoting R. 1003).) The ALJ's account mischaracterizes Dr. Cocke's statements, which describe Hise's condition during one emergency-room visit on September 13, 2010. (*See* R. 1003.) Dr. Cocke observed that Hise experienced back pain during this visit, but that there was no reason to admit her to the hospital because her strength, x-rays, and labs were normal at that time. (*Id.*) He also found no clinical reason for her to feel dizzy during this visit. (*Id.*) Dr. Cocke's observations do not support—or even address—the ALJ's conclusion that there was no evidence in the record to substantiate Hise's "claims of disabling limitations" from back pain and fibromyalgia. (R. 19.) The ALJ's reliance on Dr. Cocke's observations was erroneous. However, it does not undermine his overall assessment of Hise's claims of pain.

or that his credibility finding is not supported by substantial evidence. *See id.* ("But this imperfect analysis does not undermine the ALJ's conclusions entirely.") Moreover, one of the good reasons Hise notes—lack of transportation—is belied by the record. Dr. Marisa Christensen arranged for transportation for Hise, but she did not avail herself of this assistance. (R. 881, 883.) And despite being unable to keep multiple appointments, Hise frequented hospital emergency rooms. The ALJ's finding of habitual non-compliance is also supported by substantial evidence that Hise missed medical appointments and did not take her medications as prescribed. (*See, e.g.*, R. 416, 419, 520, 521, 623–24, 720, 722, 740, 881, 883, 897, 924–25, 1048.)

Overall, the ALJ's analysis contains specific reasons for finding Hise's complaints "questionable" or "not credible," is supported by evidence in the record, and is "sufficiently specific to make clear" to this Court "the weight the adjudicator gave to [Hise's] statements and the reasons for that weight." Soc. Sec. R. 96-7p, 1996 WL 374186, at *2. Accordingly, I will not disturb the ALJ's credibility finding.

D.    *Hise's Ability to Perform Other Work*

Finally, Hise argues that the ALJ erred in assessing her RFC. (*See* Pl. Br. 13.) Her main objection here is to the ALJ's conclusion that Hise could frequently "handle and finger" objects with both hands even though she has "severe" carpal tunnel syndrome ("CTS"). (*See* Pl. Br. 14, 16; *see also* R. 16, 18.) At her hearing, Hise testified that her "hands constantly hurt" and that her fingers "stay numb all the time and [are] tingly." (R. 38.) She said she had "trouble grasping things, holding on to things," and "that [a] lot of times [she] will drop things." (*Id.*) Again, the ALJ was generally skeptical of Hise's testimony given her "repeat[ed] non-compliance and failure to make sincere efforts to rehabilitate." (R. 21.)

Hise argues that the "limitations associated with her CTS, as confirmed by [a nerve conduction study] and [electromyogram], significantly affect her bilateral manual dexterity which warrants a conclusion of disabled." (*See* Pl. Br. 14.) Those two studies, performed in October 2009, revealed "mild" bilateral CTS. (R. 507; *see also* R. 20.) Hise's orthopedist recommended "conservative management with cortisone injections and splinting," and instructed Hise to "follow up as needed." (R. 507.) Physical examinations in 2008, 2009, 2010, and 2011, also consistently revealed full grip strength in both hands. (*See, e.g.*, 520, 526, 62, 634, 637, 689, 692, 695, 706, 711, 732, 764, 772, 778, 784, 1134.) That was true even when Hise complained of bilateral weakness, numbness, and tingling in her upper extremities. (*See, e.g.*, R. 525–26.) The ALJ noted that Hise's CTS was mild and was treated with cortisone trigger injections and temporary use of a splint. (R. 20.)

Aside from Hise's testimony, the record contained little to no evidence of any restrictions caused by CTS. Dr. Scagnelli, the consultative physician who examined Hise in January 2011, found full strength in both hands and "no manipulative limitations on reaching, handling, feeling, grasping, or fingering." (R. 868, 869.) Dr. Scagnelli thought that Hise could perform these tasks "frequently." (R. 869.) The VE also testified at Hise's hearing that a person who could "frequently" use both hands to "finger and handle" things could work as an inspector, assembler, and packager, and that all three jobs existed in significant numbers in the national economy. (*See* R. 43–46.) That evidence substantially supports the ALJ's conclusion that Hise's CTS did not render her disabled. (R. 20.)

Hise also takes issue with the ALJ's determination that she could sit for up to 30 minutes at a time for up to six hours in an eight-hour work day as long as she had a sit/stand option. The ALJ also found that she could stand for up to 10 minutes at a time. These findings are supported

by Dr. Scagnelli's assessment, and Hise does not explicitly identify any evidence to the contrary. To the extent that she relies on Munsey's opinion, the ALJ gave ample reasons for discrediting his opinion. And the ALJ was entitled to rely on the consulting opinion of Dr. Scagnelli where it is supported by the record. *See Gordon*, 725 F.2d at 235.

Contending that the record is "replete with objective evidence of her considerable low back pain," Hise disputes the ALJ's finding that she could occasionally stoop. (Pl. Br. 15.) While the record is replete with Hise's complaints of pain, complaints are not objective evidence. Rather, the objective evidence, in the form of x-rays and other diagnostic tests, shows that Hise had only small disc bulges and mild degenerative changes. Based on this objective evidence, I cannot find that the ALJ erred in limiting Hise to occasionally stooping.

Hise asserts that the RFC does not account for her seizure disorder. The record documents Hise's numerous trips to the emergency room after alleged falls that she attributed to fainting or seizures. The ALJ correctly noted that CT scans and electrocardiographs ("EKG") taken after these alleged falls were normal. (R. 20.) Additionally, other objective tests and physical examinations from attending medical professionals showed few, if any, signs of injuries to corroborate the falls. The ALJ further noted that medication reduced her "seizure symptoms." (R. 20.) Even so, the ALJ apparently accounted for Hise's tendency to fall by requiring that she avoid exposure to hazardous machinery and unprotected heights. (*See* R. 18.)

Hise argues that her RFC should have incorporated a limit on her ability to follow instructions and interact with others because of her pain, medications, and depression. As noted above, the ALJ properly found Hise's complaints of pain not entirely credible. Hise has not cited any medical records that document any serious functional limitation caused by her medications. *See Johnson*, 434 F.3d at 658 (citing *Burns v. Barnhart*, 312 F.3d 113, 131 (3d Cir. 2002)

("Drowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations."); *Lowery v. Comm'r of Soc. Sec.*, No. 4:10-cv-47, 2011 WL 2648470, at *4 (W.D. Va. Jun. 29, 2011) ("Plaintiff has failed to show that his . . . medication side effects create limitations which should have been included in the Law Judge's RFC finding."). Lastly, the ALJ evaluated Hise's claims of mental impairments and found that they caused at most "mild" functional limitations. These findings are amply supported by the record.

Here, the ALJ based his decision on evidence in the record, including the opinion of Dr. Scagnelli. I must uphold the ALJ's RFC determination if he applied the correct legal standard and if his findings are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. I find that both requirements were met here.

## IV. Conclusion

This Court must affirm the Commissioner's decision if it is supported by substantial evidence and was reached through the correct application of the law. After carefully reviewing the record, the parties' briefs, and the applicable law, I find that both requirements were met in this case. Therefore, I **RECOMMEND** that this Court **DENY** Hise's Motion for Summary Judgment (ECF No. 14), **GRANT** the Commissioner's Motion for Summary Judgment (ECF No. 17), and **DISMISS** this case from the Court's active docket.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or

specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Michael F. Urbanski, United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: May 28, 2014

Joel C. Hoppe
United States Magistrate Judge